**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **TEDDY BEASLEY,** )<br> )<br> **Plaintiff,** )<br> )<br> **v.** )<br> )<br> **O'REILLY AUTO PARTS,** )<br> )<br> **Defendant.** )<br> ) | **CASE NO. 1:20-cv-00092-N** |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, O'Reilly Auto Parts[1], by and through undersigned counsel of record, and submits this Brief in Support of its contemporaneously-filed Motion for Summary Judgment, stating as follows:

## I.   INTRODUCTION

Plaintiff Teddy Beasley, a deaf individual proficient in sign language and lip-reading but capable of intelligibly articulating speech to hearing individuals, brings claims under the Americans with Disabilities Act (ADA) arising from his employment at the O'Reilly Distribution Center ("DC") in Saraland, Alabama. Plaintiff worked there from April, 2016 until his voluntary resignation of February 6, 2018, citing his need for a daytime shift, working his last day two weeks later. Plaintiff was a part-time "in-bound materials handler" working 4-5 hours each shift beginning at 1:00 a.m. as a member of the overnight "replenishment team," stocking shelves with

---

[1] Plaintiff's actual W2 employer was Ozark Automotive Distributors, Inc., d/b/a O'Reilly Auto Parts, which owns and operates the distribution center in question.

incoming inventory using a hand-held scan gun that provided visual descriptive information needed to stock the proper location with the correct type and number of boxes.

Plaintiff applied for this position with the help of Laura Owens, his job coach at the Alabama Institute for the Deaf and Blind ("AIDB"). Owens was personally acquainted with O'Reilly's HR assistant, Heather Bolanos, from Bolanos taking sign language classes at AIDB, and worked with Bolanos to place at least 5 deaf employees in positions at the DC. O'Reilly has a record of positive and affirmative collaboration with AIDB, even arranging sign language classes for its DC personnel to facilitate better communication with their deaf or hard of hearing co-workers. The DC was ultimately awarded the Governor's Award for its efforts to employ workers from the deaf community. Owens believed that O'Reilly did everything it should have done in connection with its employment of deaf workers, and Plaintiff in particular.

### Plaintiff's Hiring, Orientation, and Interactive Accommodation Process

Bolanos first spoke with Plaintiff about a position at O'Reilly in a phone call routed through Sorenson, a voice interpretive service, and then worked to schedule an interpreter for Plaintiff's first in-person interview. Mike Gilboe, the DC's HR supervisor, was also present at the interview, with Plaintiff advising O'Reilly of prior work experience which fit O'Reilly's needs.[2] Gilboe could communicate with Plaintiff through the interpreter, and by understanding Plaintiff's own speech.

Plaintiff had a second interview where he met O'Reilly's inbound materials manager, John McMenamin, with Plaintiff opting to do this interview without an interpreter when scheduling difficulties arose, rather than rescheduling to when an interpreter could be present. After this interview, O'Reilly offered Plaintiff a job and Plaintiff was hired, with orientation his first day.

---

[2] Plaintiff also advised O'Reilly in his interview that he had a previously scheduled family vacation requiring him to be off work for a week in July, 2016, and in recognition of his advance notice and plans already having been made for the trip, O'Reilly approved this time off from work for the month of July 2016.

Plaintiff had at least two rotating interpreters for his all-day orientation, and they interpreted for Plaintiff, including interpreting videos played during orientation which were not closed captioned. Materials from the videos were printed out for Plaintiff. Managers at the DC explained their roles to new employees and they all toured the facility, went over safety measures, and learned routines such as clocking in and out.

O'Reilly's Disability-Reasonable Accommodation Policy requires completion and submission of a "Reasonable Accommodation Request Form" if an employee is unable to perform the essential functions of their job without a reasonable accommodation. In his application for inbound materials handler, Plaintiff signed a form indicating that he was in need of an accommodation to perform the essential functions of his job. Gilboe and the O'Reilly Human Resources team scheduled an interactive accommodation process interview with Plaintiff along with Owens.

The interactive process is documented by completion of the above form reflecting discussions with the employee. Gilboe, Bolanos and Owens all attended the interactive accommodations meeting with Plaintiff. Gilboe recalls that after participating in the interactive process, Plaintiff wanted to try on-the-job training without an interpreter as he could read lips and body language very well. The O'Reilly Human Resources team made sure that Plaintiff knew that any time he felt an interpreter was needed to make him feel comfortable or perform his job easier, he could request an interpreter and one would be provided.  The interactive accommodation process and its documentation focused on discussing whether Plaintiff would need an interpreter and, if so, the phases of training and job performance for which one would be required.  However, Plaintiff, along with Gilboe, Owens and Bolanos all recalled from the meeting that Plaintiff requested to retain and use his cell phone on the job for communication, and an exception to

company policy was agreed to allowing Plaintiff to use his cell phone in the DC for communication with his supervisor as a requested accommodation.

### Plaintiff's Employment with O'Reilly:
### Glowing Performance Evaluations and Attendance Problems

Plaintiff was scheduled for his first work shift at the DC on April 21, 2016, and promptly missed it by oversleeping. Scheduled for work at 1:00 a.m., Plaintiff did not contact O'Reilly until 3:43 a.m. when he sent a text stating he overslept and would not be able to work that day. Team members are considered "no call no show," a serious violation of O'Reilly's Attendance Policy, if they miss more than two hours of their scheduled shift without notifying their supervisor. Plaintiff was issued a Final Warning on April 22, 2016, which he signed stating that he read and understood the Progressive Discipline Form.

After then going well over a year with no discipline, Plaintiff missed work from July 5, 2017 until July 14, 2017, and then called out on August 2, 2017. On August 7, 2017, Plaintiff received a documented Verbal Warning for having two attendance occurrences within six months, with Plaintiff signing that he read and understood the discipline form. Four months later, Plaintiff again violated the Attendance Policy when he was 30 minutes late for his shift on December 19, 2017 and an hour late for his shift on December 26, 2017. Plaintiff was issued a Written Warning, again signing stating that he read and understood the form.

Despite his recurring attendance issues and accompanying disciplinary notices, Plaintiff received very high praise in his performance evaluations, drawing particular compliments for his attitude, work ethic, and accuracy in inventory replenishment.  His productivity and attitude were "consistently superior," his work quality "exceeds requirements," and his job knowledge "meets requirements."

Unfortunately, Plaintiff continued to violate the Attendance Policy after his December, 2017 Written Warning, with Plaintiff receiving on February 6, 2018 a Final Warning for being late to work on January 18 and 29, 2018. Plaintiff again signed the form stating he had read and understood the infractions and the discipline being imposed. Due to the time of day Plaintiff's shift started, Migiel Adams was the only supervisor present when Plaintiff's Progressive Disciplines were issued. At no time did Plaintiff request an interpreter for his disciplinary notices; rather, he would read over the entire form and then sign it. Immediately after he received the February 6, 2018 Final Warning, Plaintiff wrote out his resignation in front of Mr. Adams and submitted it.

### Plaintiff's Written Communications with his Supervisor and O'Reilly

Plaintiff utilized his cell phone for text messages with his supervisor, Migiel Adams, and his inbound operations manager, John McMenamin, and for email communications with Ms. Bolanos.  Over the course of his 22 months of employment with O'Reilly, available documented evidence shows that Plaintiff sent at least 5 text messages to McMenamin, 18 text messages to Adams, and 15 email messages to Bolanos.[3] Plaintiff sent screenshots of physician notes to Adams and McMenamin for excused absences, and complained to Adams about a co-worker's work area being "messy" or items not being properly stored. Plaintiff would also text Adams about what he perceived as incomplete or unclear comments at shift meetings, with clarifying responses from Adams.  *Id.*  In his email communications with Bolanos in Human Resources, Plaintiff would request information needed for pay and benefits administration, plus inquire about company job openings. On one occasion when security staff inadvertently prohibited his cell phone use in the

---

[3] See Exhibit 4. Plaintiff produced none of his own copies of email messages in discovery in this case, and the copies of those messages were produced by O'Reilly.  Plaintiff did, however, produce screenshots of his text messages with his supervisor Migiel Adams and his inbound operations manager John McMenamin.

DC, Plaintiff was very quick to complain via angry email message to Bolanos, who quickly resolved the matter. Plaintiff pointed out to Bolanos in that message that the retention and use of his cell phone was specifically agreed to by the Company as his means of communication on the job.

### No Instance of a Written Request for Interpretive Assistance

Not once during his entire employment with O'Reilly did Plaintiff ever send a text message or email requesting an interpreter in order to perform the essential functions of his job. Nor did Plaintiff ever request in writing, through text or email message, the assistance of an interpreter or any other accommodation to understand his disciplinary notices, performance reviews, or for any other workplace activity. And the record is wholly devoid of any documentation of such request being made verbally.

## II.     NARRATIVE SUMMARY OF UNDISPUTED FACTS

### Plaintiff's Interview and Hiring

Plaintiff Teddy Beasley is a deaf individual proficient in American Sign Language. (Beasley I depo., p. 8:16-21). Plaintiff was hired at the O'Reilly DC in Saraland in April 2016 (EEOC Charge, March 8, 2018, EEOC 015) as a part-time inbound materials handler working 4-5 hours a night, and 20-25 hours each week. (Beasley I, pp. 109-110: 21-23, 1-5). Plaintiff was part of the Replenishment Team, whose shift always started at 1:00 a.m. (Beasley II depo., p. 40: 2-14). The DC is a warehouse operation, and Plaintiff's job was to replenish incoming inventory on the shelves utilizing a handheld scan gun (an "RF gun") with a visual display informing the user how much inventory to replenish. (Beasley I, pp. 174:13-175:20).

After a brief group meeting each night, Plaintiff met alone with Adams, his supervisor, who would tell Plaintiff what he needed to do that shift, sometimes writing it out. (Beasley I, pp.

119:23-121:5). Then, Plaintiff would go to his location and begin stocking from boxes placed on pallets, using an RF gun and order sheets from Adams to determine where the products go, noting any discrepancies for Adams. (Beasley I, pp. 168:16-176:1). Plaintiff was allowed to use his cell phone during work to communicate with Adams, and Plaintiff also relied on co-workers for help. (Beasley I, pp. 37:18-38:3, 38:13-39:2).

Plaintiff was the first of several deaf or hearing impaired individuals hired by O'Reilly at the DC, the product of many discussions between Laura Owens of the Alabama Institute for the Deaf and Blind (AIDB) and Heather Bolanos, a human resources assistant at the O'Reilly DC.[4] (Owens depo., pp. 8:9-19, 42:9-43:17, 53:11-24). Plaintiff chose to work the overnight shift, while other deaf workers hired later worked day shift. (Owens depo., p. 42:9-25). None of these workers required an interpreter for their shift. (Owens depo., pp. 55:24-56:11). As a job developer at AIDB, Owens would not have placed individuals at the DC if they could not be independent and required an interpreter every day, and Owens characterizes Plaintiff as very capable of regular employment. (Owens depo., pp. 64:12-65:8).

Bolanos served as human resources assistant from October of 2015 through early 2018. (Bolanos depo., p. 7:1-24). Bolanos had completed a course in American Sign Language at AIDB and repeated the course in 2015-2016. (Bolanos depo., p. 9:3-21). Bolanos also participated in a shortened version of the same class that O'Reilly offered at the DC. (Bolanos depo., p. 9:15-17). Bolanos first spoke with Plaintiff in a phone call routed through Sorenson, a voice interpretive service. (Bolanos depo., pp. 13:7-14:4). Bolanos then worked with Plaintiff on scheduling an

---

[4] One of Plaintiff's alleged complaints, vaguely postured as in the nature of a requested accommodation, regarded needed emergency lighting in the DC. The testimony of record is that the DC was equipped with emergency lighting in fixed locations and on certain moving equipment, as well as emergency sirens. (Goff depo., p. 33:4-25; Lutton depo., pp. 11:12-12:17). Plaintiff was apparently unaware of these lighting systems (they hadn't engaged during his night shift), and appeared surprised when told during deposition about the emergency lighting installed and functioning at the DC. (Beasley I, pp. 167:17-168:14).

interpreter for Plaintiff's first in-person interview, where Bolanos communicated with Plaintiff through the interpreter. (Bolanos depo., pp. 17:19-18:18, 20:10-25). Mike Gilboe, the distribution center's human resources supervisor, was also present at this interview. (Gilboe depo., pp. 8:16-25, 17:2-12, 93:16-19). Bolanos was interested in how well Plaintiff would fit the available position, and Plaintiff had a great interview, advising O'Reilly of prior work experience which fit O'Reilly's needs. (Bolanos depo., pp. 21:23-22:4, 49:1-22).

Gilboe was able to communicate with Plaintiff through the interpreter, but also just by understanding Plaintiff's own speech. (Gilboe depo., pp. 21:7-22:8). Plaintiff had a second interview where he met O'Reilly's inbound materials manager, John McMenamin, with Plaintiff choosing to proceed with this interview without an interpreter when scheduling difficulties arose rather than rescheduling to when an interpreter could be present. (Bolanos depo., pp. 52:18-53:23, 56:13-21). After this interview, O'Reilly decided to offer Plaintiff a job. (Bolanos depo., p. 118:3-18). Plaintiff was hired and after reference and background checks, orientation would have been Plaintiff's first work day. (Gilboe depo., p. 37:17-25).

Plaintiff had at least two rotating interpreters for his orientation, an all-day event. (Bolanos depo., pp. 39:14-16, 107:16-20; Owens depo., p. 20:2-18). They interpreted for Plaintiff, including interpreting videos during orientation which did not have closed captioning, with materials from the orientation videos printed out for Plaintiff. (Bolanos depo., p. 109:4-24). During orientation, different leaders at the DC explained their roles to new employees and they all toured the facility, went over safety measures, learned to clock in and out, etc. (Owens depo., pp. 66:16-67:8).

### Plaintiff's Request for Accommodation and O'Reilly's Interactive Process

In his application for inbound materials handler, Plaintiff signed a form indicating that he was in need of an accommodation to perform the essential functions of his job. (O'Reilly 00189).[5] O'Reilly's Disability-Reasonable Accommodation Policy requires completion and submission of a "Reasonable Accommodation Request Form" if an employee is unable to perform the essential functions of their job without a reasonable accommodation. (O'Reilly 00252-00254). This Form guides the discussion with the employee about accommodations, and was filled out and submitted for Plaintiff as part of the interactive process. (Bolanos depo., p. 62:6-10; O'Reilly 00257-00264).

Plaintiff's job coach and interpreter, Laura Owens, was present with Plaintiff for this discussion, along with HR representative Heather Bolanos. (Bolanos depo., p. 81:13-17; O'Reilly 00257-00264). Bolanos recalls that going forward, Plaintiff could request an interpreter if needed. (Bolanos depo., pp. 36:13-38:10). Plaintiff clearly could understand this discussion, and could converse back and forth. (Bolanos depo., pp. 80:10-81:6). O'Reilly Human Resources Manager Michael Gilboe was also present, recalling the discussion with Plaintiff that an interpreter may not be needed moving forward, but an interpreter could be brought back in if Plaintiff requested one down the road. (Gilboe depo., pp. 45:15-46:22, 51:12-18). If Plaintiff requested an interpreter, one would be provided to him. (Gilboe depo., pp. 51:19-52:11). Gilboe recalls also that as part of the accommodation meeting with Beasley, and in addition to the provision of an interpreter in the future if requested, it was agreed that Plaintiff could retain his cell phone with him in the warehouse for communications with his supervisor and others, even though other employees had to leave their phones in a locker. (Gilboe depo, pp. 105:3-106:3).

---

[5] References to a document bearing an O'Reilly bates-labeled number, unless referenced otherwise, are located within Exhibit 11 to Defendant's Notice of Filing Evidence.

Owens, who was present, recalled that as part of the accommodation meeting, Beasley requested use of his cell phone as an exception to policy, and O'Reilly agreed to that request, later implementing that as a policy for all deaf employees.  (Owens depo, p. 23:9-25)  Owens also clearly understood that after he began work, if Plaintiff requested an interpreter for some aspect of his job, one would be provided. (Owens depo., pp. 71:25-72:23). Bolanos' recollection was consistent, recalling that they discussed and approved Beasley's use of his cell phone in the warehouse for communication, both with text messages and email communications with her. (Bolanos depo., p. 41:2-14)

### O'Reilly's Corporate Outreach to Deaf and Hearing Impaired Workers

In collaboration with the AIDB, O'Reilly had sign language classes set up for its personnel at the DC so they could better communicate with their deaf or hard of hearing co-workers. (Owens depo., pp. 25:15-26:4). O'Reilly's distribution center was ultimately awarded the Alabama Governor's Award for Disability for its efforts to employ workers from the deaf community. (Owens depo., pp. 59:20-61:3). Owens feels that O'Reilly did everything it should have done in connection with its employment of deaf workers like Plaintiff. (Owens depo., pp. 54:14-55:10).

### Plaintiff's Replenishment Team Job Duties On The Overnight Shift

Plaintiff was confident that he did not need an interpreter at 1:00 a.m., that he already had an idea of what he was doing and could pick it up pretty quickly, and that he could perform the essential functions of the inbound materials handler position. (Bolanos depo., pp. 66:15-67:23, 103:20-104:4). Replenishment Team members on Plaintiff's shift, usually about five workers, would be the only ones in the warehouse. (Beasley I, pp. 84:20-85:19; Beasley II, pp. 40:23-41:11). Plaintiff worked from 1:00 a.m. until 5:00 or 6:00 a.m., a total of 20-25 hours per week. (Beasley I, pp. 108:14-23, 109:22-110:5). The shift would begin with a short meeting at 1:00 a.m. of the

Replenishment Team members that would conclude with stretching exercises. (Beasley I, pp. 110:6-111:3). Plaintiff calls this a "presort" meeting. (Beasley II, pp. 41:12-43:2). These presort meetings are the only meetings Plaintiff attended during his O'Reilly employment. (*Id.*). Plaintiff attended no large group meetings during his O'Reilly employment. (Beasley II, pp. 48:17-49:16).

Plaintiff then met with Adams, his supervisor, separately, and Adams would tell Plaintiff what he needed to do that shift, sometimes writing it on a piece of paper. (Beasley I, pp. 119:23-121:5). Then, Plaintiff would go to where he was supposed to work and begin stocking from boxes placed on pallets, using a scanning gun and order sheets from Adams to determine where the products were to go, noting any discrepancies for Adams. (Beasley I, pp. 168:16-176:1). Plaintiff could use his cell phone during work to facilitate communication with Adams, and Plaintiff also relied on his co-workers for help. (Beasley I, pp. 37:18-38:3, 38:13-39:2).

Bolanos served as a "go-to" person for Plaintiff on many things, with Plaintiff and Bolanos communicating through a combination of sign language, email, texting and showing their phones, and handwriting, together with verbal communication and lip-reading. (Bolanos depo., pp. 30:21-31:17, 44:12-17). Similarly, Plaintiff would communicate with others in the front office through some combination of writing (email), vocalizing and lip-reading. (Bolanos depo., p. 35:3-11). Bolanos recalls having a discussion with Plaintiff about an interpreter for a company picnic, and Bolanos requested an interpreter. (Bolanos depo., pp. 25:10-20, 42:11-16). This was the only discussion she had with Plaintiff following his orientation in which Plaintiff wanted an interpreter. (Bolanos depo., p. 28:8-21).[6] Plaintiff communicated with Bolanos on administrative matters such

---

[6] Plaintiff claims he asked his supervisor for an interpreter during his overnight shift when he was doing forklift training at some point, but is unsure if Adams heard him or understood him. (Beasley I, pp. 65:14-66:7; Beasley II, pp. 52:11-54:9, 57:23-58:8). Plaintiff asked no one else for an interpreter for forklift training, and he never asked Adams again. (*Id.*; Beasley II, pp. 55:6-57:5).

as payroll, on an instance where a security guard would not allow Plaintiff access to his cell phone in the DC, on job openings at the DC on the day shift, and later, on his resignation from employment. (Beasley depo. Exhs. 10, 11, 13; O'Reilly 00426).[7]

Ultimately, Plaintiff's job coaching agency would not provide an interpreter for the company picnic since it was outside of work hours (social) and after Plaintiff's first 90 days of employment, and the picnic also coincided with a local interpreter convention which caused Bolanos difficulty finding an interpreter. (Bolanos depo., p. 90:5-22; Owens depo., pp. 48:6-49:19). Plaintiff's wife attended the company picnic with him and provided sign language interpretation. (Beasley II, p. 46:18-22). Bolanos' young daughter, who took a sign language class with Bolanos, was able to converse with Plaintiff at the picnic. (Bolanos depo., p. 98:8-17).

**Plaintiff's Written Communications with his Supervisors and O'Reilly Human Resources**

Plaintiff utilized his cell phone for text messages with his supervisor, Migiel Adams, and his inbound operations manager, John McMenamin, and for email communications with Ms. Bolanos. (*See* Exhibit 4, Table of Communications from Plaintiff, and supporting documents cited). Over the course of his 22 months of employment with O'Reilly, available documentation shows that Plaintiff sent at least 5 text messages to McMenamin, 18 text messages to Adams, and 15 email messages to Bolanos. *Id.*

Plaintiff sent screenshots of physician notes to Adams and McMenamin for excused absences, and would complain to Adams about a co-worker's work area being "messy" or items not being properly stored. *Id.* (O'Reilly 00331-00332, 00334-00337, 00375-00385) Plaintiff would also text his supervisor Adams about what he perceived as incomplete or unclear comments at shift

---

[7] Documents labeled as Beasley deposition exhibits are found at Exhibit 3 of the Notice of Filing Evidence.

meetings, with clarifying responses from Adams.  *Id.* (O'Reilly 00029, 00031-00034, 00375-00376, 00379, 00385) In his email communications with Bolanos in Human Resources, Plaintiff would request information needed for pay and benefits administration, plus inquire about company job openings, among other topics. *Id.* (O'Reilly 00045-00047, 00342-00345, 00350, 00421-00428, 00436) On one occasion, when security staff inadvertently prohibited his cell phone use in the DC, Plaintiff was very quick to complain via an email message to Bolanos, who quickly resolved the matter. *Id.,* (O'Reilly 00045-00047, 00425-00428)

### Plaintiff's Job Performance and Disciplinary Record

Plaintiff acknowledges receiving a Final Warning for missing his very first shift of work in April, 2016 by oversleeping. (Beasley I, pp. 78:16-80:1; Beasley depo. Exh. 5). Plaintiff was placed on probation for a year, but had no other disciplines prior to July of 2017. (Beasley I, pp. 46:3-13, 86:20-87:2). This discipline was in accord with O'Reilly's Attendance Policy. (O'Reilly 00120-00123).

Plaintiff received written performance reviews periodically during his employment, and was able to review and sign them. (Beasley depo. Exhs. 6-9; Beasley I, pp. 81:7-83:6, 92:2-9, 102:1-7). The performance reviews speak for themselves, as aside from Plaintiff's issues of attendance and punctuality, his work performance was well above average and he received periodic raises during the course of his employment.[8] (*Id.*; Beasley I, p. 107:14-17). Passages from Plaintiff's performance reviews reflect his performance on the job:

> "Teddy exemplifies a win-win attitude at all times. He is positive and maintains a cheerful and cooperative disposition as he performs his tasks and in his relationships among peers and supervisors.

---

[8] Plaintiff is not claiming he was paid less than other inbound materials handler workers, and has no knowledge that raises he received were less than those of other similar workers . (Beasley II, pp. 65:15-20, 67:1-10). Plaintiff is not claiming that he was prevented from applying for other jobs within O'Reilly (Beasley II, p. 71:14-18).

Teddy gladly accepts his tasks and takes the initiative to ensure nothing is left undone." (Beasley depo. Exh. 7).

"Teddy is a valued part of the Replenishment Team and sets the tone daily for his fellow teammates when it comes to his productivity and teamwork. Teddy is always positive and ready and willing to help." (Beasley depo. Exh. 8).

"Teddy does a great job accurately stocking all items in the proper manner in which the location calls for. Teddy's [replenishment] locations have been more picker friendly and any time the order selector has a suggestion Teddy does his best to accommodate them." (Beasley depo. Exh. 9).

Plaintiff thought he was doing well in his employment, and his only disciplines from O'Reilly related to attendance or coming to work late. (Beasley I, pp. 93:11-16, 106:8-18). Plaintiff received and signed a written disciplinary notice designated as Verbal Warning dated August 7, 2017. (Beasley I, pp. 46:12-47:6; Beasley depo. Exh. 4). The notice cited Plaintiff missing work from July 5 through July 14, though Plaintiff claims he had been approved by O'Reilly for a vacation and also had a doctor's excuse for the absence. (Beasley depo. Exh. 4; Beasley I, pp. 48:20-49:21). The notice also cited that Plaintiff had called out of work on August 2, 2017, which Plaintiff acknowledges. (Beasley I, p. 59:1-18).

After receiving the disciplinary notice on August 7, 2017, Plaintiff began looking for a day shift job as a materials handler at the DC, applying for an open position on day shift and emailing Bolanos about the job.   (Bolanos depo., p. 113:4-22 *and* Exhibit 4, O'Reilly 00343-00344). Beasley wanted to be able to accommodate child care needs, or a similar scheduling concern. (Bolanos depo., p. 114:9-15).  Even though the day shift position was full-time with benefits, Beasley ultimately withdrew from consideration for the position. *See note 5, infra.*

Four months after his August 7, 2017 disciplinary warning, and after declining the day shift position, Plaintiff received and signed a disciplinary notice on December 28, 2017 entitled

Progressive Discipline Step: Written Warning. (Beasley I, pp. 33:22-34:17; Beasley depo. Exh. 3). Plaintiff recalls clocking in to work late twice in December, 2017. (Beasley I, pp. 42:23-43:6).

### Plaintiff's Resignation from Employment at O'Reilly

After two more instances of clocking in late for work, Plaintiff received and signed a disciplinary form noting a Final Warning, dating the document February 6, 2018. (Beasley I, pp. 27:19-23, 28:7-10; Beasley depo. Exh. 2). The form recites that Plaintiff received a Written Warning for attendance on Dec. 26, 2017, which Plaintiff acknowledges receiving. (Beasley I, pp. 29:12–30:2; Beasley depo. Exh. 2). Plaintiff acknowledges having clocked in late for work twice subsequently as indicated on the Final Warning form. (*Id*.; Beasley I, p. 33:3-6).

In response to this February 6, 2018 discipline, Plaintiff immediately wrote out a resignation of his employment on that same day. (Beasley I, p. 19:4-13; Beasley depo. Exh. 1) ("I'm turning in my 2 weeks resignation as of 2-6-18"). Plaintiff gave his resignation letter to his supervisor, Adams. (Beasley I, pp. 21:23-22:6). Plaintiff emailed Bolanos later that same day, stating that "I know you had no hand in any of my issues… I would love to stay here at O'Reillys.. however, *I cannot continue to work night shifts anymore* and also would love to see O'Reilly improve inside and out."[9] (Beasley I, pp. 142:21-143:3; Beasley depo. Exh. 13)(Emphasis added).

---

[9] Beginning in August of 2017, Plaintiff emailed Bolanos seeking to move from the night shift to a day shift material handler position. (Beasley depo. Exh. 10; Beasley I, pp. 129:12-18, p. 137:8-15). Though the day shift position would have given Plaintiff 40 hours per week, Plaintiff elected to withdraw his name from consideration because the hourly pay was the same, minus the .25 per hour night shift differential. (Beasley depo. Exh. 10). In January of 2018, less than a month before his resignation, Plaintiff emailed Bolanos stating "I need to seek daytime, maybe mornings or something like that" and "I need to change my times." (Beasley depo. Exh. 11).  Owens, Plaintiff's job coach from AIDB, recalls that Plaintiff expressed later that he did not like the night shift work and wanted to make changes in his shifts. (Owens depo., pp. 35:15-36:4, 63:2-6).

## Plaintiff Immediately Initiates his EEOC Claim

One week after his resignation, on February 13, 2018, Plaintiff prepared a factual summary that he submitted to the EEOC (EEOC 020) as part of his claim intake form, which he signed on February 16, 2018. (EEOC 020-024 at Exh. 5).  While preparing his EEOC submission, he emailed Bolanos several times seeking information that apparently was called for in the intake questionnaire (Exhibit 4, O'Reilly 00440-00441), although he did not disclose to Bolanos the purpose behind his inquiries.  He denied in his deposition that he was in contact with the EEOC at this time. (Beasley I, p. 151:4-7; Beasley depo. Exh. 12)

## Plaintiff Admits He Never Made a Written Request for Further Accommodations

Despite his many communications with his supervisor and Ms. Bolanos through text messages and email respectively, on a wide variety of subjects, Plaintiff admits he never made a written request to any O'Reilly representative for an interpreter through text, email or other writing, but instead claims he made such a request verbally. (Beasley I, pp. 25:6-13, 26:4-10, 26:19-21, 27:4-7). But he never made a verbal or written request for further accommodations assistance to Laura Owens, his job coach from AIDB. (Beasley I, p. 35:2-8). O'Reilly in the past has hired other interpreters for its deaf or hearing impaired employees, and Owens has communicated with Bolanos at O'Reilly about those needs from time to time. (Owens depo., pp. 45:11-46:17). Owens knows of no time that an O'Reilly employee asked for a sign language interpreter and was not provided one. (Owens depo., p. 74:5-11).

While Plaintiff denies it, the EEOC investigator assigned to Plaintiff's claim recorded Plaintiff confirming that he never made a request to O'Reilly for an interpreter, but O'Reilly "should have known" and taken action even when he did not inform them. (Exh. 5 at EEOC 012).

Plaintiff now works at an Amazon distribution center and, since completing his training, has not needed an interpreter to perform his job. (Beasley I, p. 17:8-22; Beasley II, p. 14:2-10). As part of his application at Amazon, Plaintiff did not request any accommodation for interpretive or communication assistance at Amazon, and only requested a vibrating scan gun, which request was initially denied due to equipment compatibility issues.   (See Exh. 12, Amazon's "Job Accommodation Report," AMZN 000014.)   At Amazon, Plaintiff arrives and gets his scan gun, receives his assigned station by looking at a monitor and, once there, scans code on products on various pallets to ensure the product matches the pallet and, if it does not, re-routes the product. (Beasley II, pp. 14:2-25:14).   Amazon workers are able to keep their cell phones in the warehouse, as he was allowed to do at O'Reilly. (Beasley II, pp. 27:13-28:13).

## III.    STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is proper when the non-moving party fails to establish the existence of a genuine issue as to any material fact on an essential element of that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Once the party moving for summary judgment makes a *prima facie* showing that the non-movant does not have sufficient evidence to prove its case, the burden then shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial.   *Id*. at 323–324.   "To defeat a motion for summary judgment, the [non-movant] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party.   Summary judgment may be granted if the evidence [in the non-movant's favor] is 'merely colorable.'"   *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) (emphasis added).

## IV.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ADA DISCRIMINATION CLAIMS

In his Complaint, Plaintiff sets forth his claims against O'Reilly as follows, separated and numbered below by statutory basis for clarity:

I.      Defendant discriminated against Plaintiff on the basis of his disability by discriminating against him in regard to the terms, conditions, and privileges of employment in violation of 42 U.S.C. § 12112(a);

II.     Limiting him in a way that adversely affects his opportunities and status in violation of 42 U.S.C. § 12112(b)(1);

III.    Using methods of administration that have the effect of discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(3);

IV.     Failing to make reasonable accommodations in violation of 42 U.S.C. § 12112(b)(5)(A);

V.      Denying employment opportunities based on the need to make such accommodations in violation of 42 U.S.C. § 12112(b)(5)(B);

VI.     Retaliating against Plaintiff for asserting his ADA rights in violation of 42 U.S.C. § 12203(a);

VII.    Threatening and interfering with Plaintiff's exercise of his ADA rights in violation of 42 U.S.C. § 12203(b).

(Complaint, ¶ 39)

### A.    Plaintiff's Failure To Accommodate Claim

O'Reilly first addresses the fourth enumerated claim above—the claim of Failure to Make Reasonable Accommodations —since that was the central claim set forth in Plaintiff's complaint filed with the EEOC, and arguably the only claim for which Plaintiff exhausted his administrative remedies. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, the plaintiff must show (1) that he is disabled; (2) that he is a qualified individual; and (3)

that the employer discriminated against him because of his disability. *Cooke v. Carpenter Technology Corporation,* 2020 WL 6562359, at *7. (N.D.Ala. Nov. 9, 2020) *citing Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007).

"Qualified individual," as that term is used above, means that at the relevant time, plaintiff could perform the essential functions of his job with or without reasonable accommodations; and the defendant discriminated against him by failing to provide a reasonable accommodation for his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255–56.  Plaintiff must demonstrate by a preponderance of the evidence that (1) he was a qualified individual with a disability; (2) he made a specific request for a reasonable accommodation; and (3) his employer, O'Reilly, failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable accommodation. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)(per curiam). "[T]he [employer's] duty to provide a reasonable accommodation is not triggered <u>unless a specific demand for an accommodation has been made</u>" by an employee. *D'Onofrio v. Costco Wholesale Corporation*, 964 F.3d 1014, 1022 (11th Cir.. 2020), *citing Gaston*, *supra,* 167 F.3d at 1363. Even if an employee is legally disabled, she must specifically request an accommodation to trigger the employer's accommodation obligations. *Id.*

### 1. O'Reilly engaged in the interactive accommodations process and provided the accommodations requested by Plaintiff.

Plaintiff and O'Reilly participated in the interactive accommodations process as part of his interview and orientation, and Plaintiff began his employment in O'Reilly's DC under a simple agreed-upon understanding with O'Reilly: (1) he would be allowed to retain and utilize his cell phone as a communications device for text and email communications with his supervisors and

company Human Resources staff while he was working in the DC, and (2) if at any time thereafter he needed an interpreter in the performance of his work or to "make him more comfortable" (in the express words of O'Reilly's Human Resources Manager Michael Gilboe), an interpreter would be provided for him.

Gilboe recalls the accommodation meeting with Plaintiff where it was agreed that Plaintiff could retain his cell phone with him in the warehouse, even though other employees had to leave their phones in a locker: "[W]e did allow Teddy to keep his cell phone specifically for that. If he needed to type anything out, if he needed to phone anyone or have any other outside communication, he, he was allowed to do so on top of being able to text and communicate with his supervisor." (Gilboe depo, pp. 105:3-106:3).

Bolanos also recalls that Plaintiff was allowed to retain his cell phone as an accommodation for communication. "[C]ell phones are not allowed inside the distribution center once you get through the metal detector. I believe that's when we spoke about allowing Teddy to have his cell phone with him so he could communicate pretty quickly with his supervisor....Teddy had his supervisor phone number, like I said, with the cell phone, had email access, you know, he had the email addresses. He had my email address…" (Bolanos depo., p. 41:2-14)

Laura Owens, Plaintiff's job coach and interpreter, echoes the recollections of Gilboe and Bolanos: "[W]e did have a meeting giving him (Plaintiff) the ability to have his phone, because O'Reilly's (sic) does not allow cell phones on the floor for safety reasons. So, we talked about how if Teddy—because it was overnight—if Teddy needed something or how he's gonna communicate with his boss, could he please have his cell phone so that he could text back and forth so they could communicate while he was working." (Owens depo., p 23:9-25)

And when Plaintiff was forced to leave his cell phone in a locker four months after he began work, his indignant email complaint to Bolanos below expressly confirmed his own understanding of his initial agreements with O'Reilly as to allowable use of his cell phone as a communication accommodation—*"I gave O'Reilly company a way to access communication with me as a deaf person…[s]o I consider this as a lifeline for me…"* (Exhibit 4, O'Reilly 00426):

---

**From:** beasleyteddy73 <beasleyteddy73@gmail.com>
**Sent:** Wednesday, September 6, 2017 1:45 PM
**To:** Heather Bolanos
**Subject:** Re: issue

It was ricluous  I've had my mobile phone with me for awhile... Its like a lifeline and plus commucation access for me to commcate or follow weather alerts and also I cannot hear the intercom if they announce emergency or what.. Only way to reach me is my mobile smart phone since no alarms a lights flashes wasn't installed or any form of videophone for us deaf to accessible.. And I gave O'Reilly company a way to access communication with me as a deaf person. Also that was another safety issue for me as well cuz I could be working hard and not knowing any danger around me thats happing.. So I consider this a lifeline for me until O'Reilly install some kind alerting system for. Deaf people that's is working there.... if it was a large number of co workers that they should have support system to help deaf get out or whatever. But I work with only 7 folks and we all are working separately so my Phone alert me when storm is in the area or my bosses can communication with me or I can communicate.... I just can't regularly pick up a regular phone and call or ask questions.... Or get called up to office.. I consider this an safety for me.. By the way I do not believe in violating my privage... You can ask any my coworker that works with me I do not abuse that... Sorry my rant is over... Sorry to burn a hole in your ears ...just frustrating that some people do not have common sense. To figure that out... But I know its company rules but we had this conversation and agreement in that interview room and even john

Heather Bolanos' prompt response the next morning demonstrates the efficiency and effectiveness of Plaintiff's use of this communication outlet —"If there are any other concerns or issues please don't hesitate to let me know. *Thank you for giving me a chance to look into this and make sure that you are being given the necessary means of communication during your shift!*": (*Id.*)

-------- Original message --------
From: Heather Bolanos <hjbolanos@oreillyauto.com>
Date: 9/7/17 10:11 AM (GMT-06:00)
To: beasleyteddy73 <beasleyteddy73@gmail.com>
Subject: Re:  issue

Problem solved! John Mc and Migiel both agree that  you having your cell phone is something that was discussed from the beginning of your employment and is not an issue now. Please continue taking your phone with you on your shift and utilizing it for communication with your supervisor. If there are any other concerns or issues, please don't hesitate to let me know. Thank you for giving me a chance to look into this and make sure that you are being given the necessary means of communication during your shift!

> **2.      Plaintiff could perform the essential functions of his job with the accommodation provided by O'Reilly.**

Plaintiff began his duties as an in-bound materials handler in April of 2016 and, but for his punctuality and attendance issues, there is no reason to believe that he would not still be employed in the DC today. Plaintiff was an excellent employee with frequently the highest productivity on his shift.  His performance reviews warrant repeated emphasis:

> "Teddy exemplifies a win-win attitude at all times. He is positive and maintains a cheerful and cooperative disposition as he performs his tasks and in his relationships among peers and supervisors. Teddy gladly accepts his tasks and takes the initiative to ensure nothing is left undone." (Beasley depo. Exh. 7).

> "Teddy is a valued part of the Replenishment Team and sets the tone daily for his fellow teammates when it comes to his productivity and teamwork. Teddy is always positive and ready and willing to help." (Beasley depo. Exh. 8).

> "Teddy does a great job accurately stocking all items in the proper manner in which the location calls for. Teddy's [replenishment] locations have been more picker friendly and any time the order selector has a suggestion Teddy does his best to accommodate them." (Beasley depo. Exh. 9).

Plaintiff's own descriptions of how he performed his work demonstrate detailed knowledge of the inventory replenishment process and skill in the methods utilized at the O'Reilly DC:

Q (Mr. Strasavich).  I've heard reference to an RF gun, which I'm thinking is something infrared for the UPC code.  What is that?

A.  (Mr. Beasley) It's like -- well, for example, you scan it to make sure that the product matches the size and it would tell me a number to stock.  Not -- I can't just decide how much to put up on the shelves, I have to go by what it tells me.  So if I scan and it says a hundred, then I have to count out, okay, there's stacks of 20, so I do five boxes and move them over.  And then once I get them over there, replenish with them.  So just that process over and over and over again with different orders, but it's the same process every time and different product of course.

(Beasley I, pp. 174:11-175:1).

After he resigned from O'Reilly, Plaintiff began employment in a very similar warehouse inventory stocking and routing operation, this time at a local Amazon Distribution Center.   His description of his duties at Amazon are similar to his duties at O'Reilly:

Q (Mr. Strasavich).  And then let's talk about your job at Amazon.  What type of Amazon facility is it that you work at?

A (Mr. Beasley) Well, it's a warehouse.  And my job is fulfillment.  I work in fulfillment.  That's my job.  So I'm the one that makes sure -- I scan the boxes and the packages and then build them up on the pallets and I get them ready to ship to specific locations.

(Beasley II, p. 9:6-12)

And just as he did with O'Reilly, Plaintiff declined to request the assistance of an interpreter as an accommodation once he began the job.

Q.  (Mr. Strasavich) Okay.  So back to my question.  Since you and I were last together, Mr. Beasley, since November 23rd, when your deposition was taken the first time, am I correct that you have not had to request a sign language interpreter from Amazon for your job duties?

A.  (Mr. Beasley) No, I haven't needed an interpreter for any particular issues.  I've not had any problems.

(Beasley II, p. 14:2-8)

Plaintiff cannot demonstrate that he suffered any adverse action as the result of any failure to accommodate his disability, since O'Reilly provided him with the only accommodation he

requested at the time he accepted the position. Plaintiff clearly was able to perform the essential functions of the job with the accommodation (cell phone) discussed and agreed to.

> ### 3.   Any additional accommodations requested by Plaintiff were not required for his performance of his essential job functions and therefore were not required accommodations under the ADA.

Plaintiff's claims that he requested additional accommodations beyond his initial accommodation for the use of his cell phone would fall into the category of accommodations that were not necessary for his performance of the essential functions of his job.  It is undisputed that the Plaintiff performed the essential functions of his job *without* any further interpretive assistance, even though it appeared he was frustrated at times with his supervisor's perceived communication shortcomings.  On each occasion complained of, at least insofar as documented with Plaintiff's text messages, his supervisor Migiel Adams would respond with what he judged to be the necessary details and clarification.

As the 11th Circuit noted in *D'Onofrio, supra,* "[a]dditional nuances to the reasonable accommodation framework are important to highlight as well. First, if an employee does not require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided. *D'Onofrio* at 1022, *citing Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999); *see also Albright v. Columbia Cty. Bd. of Educ.*, 135 F. App'x 344, 346 (11th Cir. 2005) (per curiam) ("[T]he record clearly shows that [plaintiff] did not require an accommodation to perform her job. It is undisputed that [plaintiff] performed her bus driving duties without an accommodation[.]"). Second, even if an employer has voluntarily provided accommodations to the employee historically, that employer is not obligated to continue providing them and can discontinue such when they exceed what is legally required under the

ADA. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) ("It is equally apparent, however, that the [City's] previous accommodation may have exceeded that which the law requires. ... [W]e cannot say that [its] decision to cease making those accommodations that pertained to the essential functions of Holbrook's job was violative of the ADA."); *D'Onofrio, supra, at* 1022.

So even though O'Reilly had committed to providing additional interpretive assistance during Plaintiff's interview, and would have done so had Plaintiff requested it, in hindsight such assistance was clearly not required in order for Plaintiff to perform the essential functions of his job as an inbound materials handler, which he performed well above expected standards.

> **4.     Plaintiff received all of the privileges of his employment with O'Reilly, was treated similarly to other employees, and had no limitations placed on his advancement opportunities**

Apart from the Failure to Accommodate claim, Plaintiff's other claims under 42 U.S.C. §12112 are unfounded general conclusory allegations of discrimination:  "[l]imiting him in a way that adversely affects his opportunities and status in violation of 42 U.S.C. § 12112(b)(1), [u]sing methods of administration that have the effect of discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(3), and [d]enying employment opportunities based on the need to make such accommodations in violation of 42 U.S.C. § 12112(b)(5)(B)."

Plaintiff applied for a specific position with O'Reilly, was awarded that position with accommodation (exception to policy to allow use of cell phone in DC for communication), performed all essential functions of the position with superior performance evaluations, requested and was offered a day shift but declined it, and voluntarily submitted his resignation after being repeatedly disciplined for attendance violations. Plaintiff acknowledges that he is not claiming that

he was paid less than other similar workers, that he received less in raises than other such workers, or that he was prevented from applying for other jobs at O'Reilly.

There is absolutely no evidence of any discriminatory conduct or resultant adverse actions in violation of 42 U.S.C. 12112 as alleged, and O'Reilly is entitled to summary judgment on these claims on that basis alone.

**B.**     **Plaintiff's Retaliation Claim**

**1.**     **Plaintiff suffered no adverse employment action that was causally related to any protected expression:  there is no evidence O'Reilly retaliated against Plaintiff in connection with any protected expression, or threatened him in any way.**

As with the allegations of deprivation of the privileges and benefits of employment, there is no evidence of record of any conduct or employer actions that could be reasonably construed as acts of retaliation or threats against Plaintiff while he was employed at O'Reilly.

The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA. 42 U.S.C. § 12203(a). To prevail on his ADA retaliation claim, Plaintiff must show that: (1) he engaged in a statutorily protected expression, (2) he suffered an adverse employment action, and (3) there was a causal link between the two. *Lucas v. W.W. Granger, Inc., 257 F.3d 1249, 1255, 1260* (11th Cir. 2001). The first element may be met by a request for a reasonable accommodation. *See Standard v. A.B.E.L. Servs. Inc.,* 161 F.3d 1318, 1328 (11th Cir. 1998). The third element requires a showing of but-for causation. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 133 S.Ct. 2517, 2533–34, 186 L.Ed.2d 503 (2013).

"In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997). "[W]hile [the Eleventh Circuit has] held that awareness of

protected expression may be established based on circumstantial evidence ... [a plaintiff must] show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Id*. And "in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression ...." *Id.*

Assuming that Plaintiff's unverified requests for an interpreter in various settings (following his orientation), as well as the alleged requests for emergency lighting in the work area (which were actually in place, though Plaintiff purported to be unaware of such lights) constituted protected expression, there is no evidence that either request was in any way related to adverse actions in the form of discipline received for attendance issues, or for Plaintiff's own voluntary termination of his employment. The evidence of record shows that Plaintiff voluntarily resigned, and that his prior disciplinary warnings were based on undisputed attendance infractions which Plaintiff acknowledged in violation of written company policy. There is no evidence of the required element of but-for causation or Defendant's knowledge of the alleged requests before Plaintiff tendered his resignation, and Defendant is entitled to summary judgment on this claim.

2. **Alternatively, Plaintiff's claims under 42 U.S.C. 12203(a) (retaliation), 12112(b)(1), (b)(3) and (b)(5)(b) are barred as falling outside the scope of Plaintiff's EEOC complaint.**

Plaintiff's EEOC complaint was signed on March 8, 2018, although he transmitted the particulars of his complaint several weeks earlier on or about February 13, 2018.[10] Under the box

---

[10] On February 13, 2018, Plaintiff prepared a factual summary that he submitted to the EEOC (EEOC 020) as part of his claim intake form, which he signed on February 16, 2018. (EEOC 020-024). While preparing his EEOC submission, he emailed Bolanos several times seeking information that was called for in the intake questionnaire (Exhibit 4, O'Reilly 00440-00441). When asked about the timing of his EEOC communications when requesting information from Bolanos on February 16, 2018, Beasley denied in his deposition testimony that he was in contact with the EEOC at that time. (Beasley I, p. 151:4-7; Beasley depo. Exh. 12).

calling for "Discrimination Based on": he does not check the box for "retaliation" or for "other," but only checks the box for "disability."   (Exh. 5 at EEOC 015-016).   The "particulars" of Plaintiff's EEOC charge are excerpted verbatim below:

> I am deaf. The Respondent failed to provide me with reasonable ccommodations. As a result, I felt compelled to resign on February 20, 2018.
>
> I was hired by the Respondent in April 2016 as an 1B Material Handler. During each interview I had with the Respondent, I informed them of the need for an accommodation. Specifically, I asked for communication access (which would include the use of an Interpreter and other communication aides) and lights that would notify me of any potential hazards.
>
> During my employment, the Respondent did not provide any assistive listening devices or worker alert systems. Although it would not have posed an undue hardship to provide visual or vibrating alerting devices, the Respondent failed to do so. I complained about safety issues on multiple occasions yet no corrective action was taken. I complained about the Respondent's failure to provide communication access. No action was taken which resulted in me not being able to actively participate in Team meetings with Supervisor. I would text questions to Adams from my cell phone. There was no engagement by my Supervisor or by the Respondent. Although he would talk for several minutes he would respond back with a one sentence text.
>
> In late December 2017 or January 2018, I was given a written warning for attendance. The warning referenced two prior verbal warnings. No one communicated to me that I had been warned about any attendance issues. Prior to being hired, I discussed with the Respondent (to include Michael Gilboe) the need to take one week off during the summer. I was told this was not a problem. I always submitted my requests ahead of time and followed the rules with respect to requesting time. In late December 2017 or January 2018, I was told that I had been verbally warned about my attendance for taking time off during the summer in 2016 and 2017. Not only was I not told that I had been verbally warned, an Interpreter was not present for any alleged verbal counseling sessions. When I was issued the written warning, an Interpreter was not present. I shared my concerns with Human Resources; however, to my knowledge the disciplinary actions were not rescinded.
>
> On multiple occasions, I informed the Respondent that I needed some type of warning alert (e.g. flashing lights) in case of a fire or if there was a need to evacuate. No such system was installed.
>
> Shortly after I gave notice to my Supervisor of my resignation, I communicated with Human Resources. I reiterated my complaints regarding the lack of communication access and the failure to provide a safe work environment.

I was discriminated against in violation of Title I of the Americans with Disabilities
Act Amendments Act of
2008.

*Id.*

In his charge narrative, Plaintiff clearly is asserting a charge grounded in failure to make a

reasonable accommodation, alleging that he requested assistance of an interpreter in various

settings, as well as emergency lighting. Plaintiff's EEOC complaint is devoid of any allegation of

discriminatory administrative practices, deprivation of job opportunities, or retaliation based on a

statutorily protected activity. Plaintiff's EEOC charge contained no factual allegations which could

be reasonably construed as complaining about the statutory violations later set forth in his civil

Complaint, aside from Defendant's alleged failure to make a reasonable accommodation.

Before filing a civil complaint alleging violations of Title VII, an employee must exhaust

his administrative remedies by first filing a timely charge of discrimination with the EEOC. *Ortiz*

*v. Waste Management Inc. of Florida,* 808 Fed. Appx. 1010, 1014 (11th Cir. 2020) *citing Stamper*

*v. Duval Cty. Sch. Bd.,* 863 F.3d 1336, 1339 (11th Cir. 2017). The purpose of the exhaustion

requirement is to allow the EEOC "the first opportunity to investigate the alleged discriminatory

practices to permit it to perform its role in obtaining voluntary compliance and promoting

conciliation efforts." *Gregory v. Ga. Dep't of Human Res.,* 355 F.3d 1277, 1279 (11th Cir. 2004).

Given the importance of the exhaustion requirement, a plaintiff's civil complaint under

Title VII "is limited by the scope of the EEOC investigation which can reasonably be expected to

grow out of the charge of discrimination." *Id*. at 1280. In determining whether a complaint falls

within the scope of the EEOC charge, we consider whether the complaint is "like or related to, or

grew out of, the allegations contained in [the] EEOC charge." *Ortiz, supra,* at 1014.  Judicial claims

that merely "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint are

permissible; but a judicial complaint may not assert "allegations of new acts of discrimination." *Id*. at 1279-80.

Defendant is entitled to summary judgment on Plaintiff's Title VII claims brought under 42 U.S.C. 12112(b)(1), (b)(3), (b)(5)(B) and 12203(a) (retaliation) as being outside the scope of Plaintiff's EEOC charge.

## V.      CONCLUSION

For all of the foregoing reasons, summary judgment is due to be granted in favor of Defendant on all claims.

Respectfully submitted,


*/s/ H. William Wasden*
H. WILLIAM WASDEN          (WASDH4276)
bwasden@burr.com
MICHAEL D. STRASAVICH      (STRAM9557)
mstrasavich@burr.com

*Attorneys for Defendant*
*O'Reilly Auto Parts*

**OF COUNSEL:**
BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, AL 36602
Tel:    251-344-5151
Fax:    251-344-9696

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 3rd day of May, 2021:

Andrew Rozynski
arozynski@eandblaw.com
William Juhn
wjuhn@eandblaw.com
Eisenberg & Baum, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
*Attorney for Plaintiff*

Edward I. Zwilling
edwardzwilling@zwillinglaw.com
The Law Offices of Ed Zwilling
4000 Eagle Point Corporate Drive
Birmingham, AL 35242
*Attorney for Plaintiff*

*/s/ H. William Wasden*
Counsel